I think we're ready. Please proceed. Good morning, Your Honor. May it please the Court. My name is David Craven. I'm with Craven Trade Law, and I'm here today on behalf of La Molisana S.p.A. in connection with an appeal from the Court of International Trade. This is a relatively simple case. The question comes down to whether the facts of record and the like support the reclassification of certain shapes as part of the model match. On page 17 of the Blue Brief, you say that Commerce's list of pasta shapes is essentially immutable. But in its redetermination on page 50 of the Joint Appendix, Commerce explains that a respondent can either submit a properly supported request to expand the list or argue that there are compelling reasons to change Commerce's methodology. Did you ever submit a properly supported request? And if so, where is it on the record? No, Your Honor, because that was not at the time, I believe, the standard before the agency. What we did explain is we provided production speeds for a number of our cuts, showing that what the Department had characterized as a standard cut, I'm sorry, as a special cut was in fact a standard cut based on throughput. And it was relying upon a prior precedent, including language from the courts, which had stated that speed was, the determination of special versus standard was shorthand for production speed. There are- The problem you have in your case is that you were just talking about your own production speed. Yes, Your Honor. And these categories are established and they're based on industry standards. So I think part of the reason that your request, whatever the parameters, was rejected is that you weren't claiming that there was a change in a different industry-wide standard speed. You were just offering it for your company. And Commerce concluded that's not adequate. Why are they wrong? Well, firstly, it is impossible for a single pasta company to claim a change in industry-wide standard. Simply put, we don't have access to the data of our competitors. Secondly, when we're dealing with the calculations of costs and the like, costs are not based on the industry standard. Costs are based on the standard of the respondent. And we're not arguing that for a folly, it's a long cut versus a short cut. The simple question is, is it a special cut or is it a standard cut? And that is based on our production speeds. I would have thought your answer to the question would be in the fourth administrative review, they looked at individual line speed in classifying and that this decision is inconsistent with that. I would have thought that would have been your argument. That is one of our arguments, yes, Your Honor. Okay, what did Commerce say here about the distinction between this situation and the fourth administrative review situation? Ultimately, they said in the fourth administrative review... No, no, no. Not in the... Here, in this case. Yes, Your Honor. What did they say was the distinction between this case and the fourth administrative review? The distinction was they made a mistake in the fourth administrative review. Where do they say that? They said that in... It's actually in the brief of the defendant, Appali, where they cite to where Commerce stated that had they had more time and had they noted the difference in... Had they noted that we were seeking to reclassify cuts that Commerce had classified, they would not have permitted it. Where? I'm sorry, just a second, Your Honor. Two red briefs, so which one are you talking about? I was looking for the Commerce decision here, not their brief. It's from comment 19 from the issues and decisions memorandum for the fourth administrative review. No, no, no. I'm not talking about that. I'm saying in this case, what did Commerce say about the distinction between this case and the fourth administrative review? I do not recall, Your Honor. Let me take you back to your first... Your answer to my first question where you said that Commerce changed its position. And I go to the appendix at page 50 where they disagree with the court that existing shapes were treated as immutable. But then they say the list can be... They say we're clarifying the list can be expanded. But they say if a respondent produces a type of pasta that does not appear among the 256 pasta shapes, the department's questionnaire and instructions allow the respondent to report new pasta shapes with the following evidence. And it was a photograph and so on. That questionnaire didn't change. It had been that way before. Yes, Your Honor. Yes, Your Honor. And we did report and we do report in administrative reviews shapes that are not called for by name. But that's part of the issue is that when you use a name, a name does not necessarily mean that the cut is new. And, in fact, as we noted in our brief, there are some inconsistencies. There are cuts that the same dye is used and it has different names. And CMS has classified some of the cuts off those dyes as specialty cuts and some of those cuts as standard cuts. And so, therefore, it creates somewhat of a difficulty where the determination is based on the name on the bag, not on the actual product. You're assuming that, of course. Well, no. My record evidence is that it's based solely on the name on the bag as opposed to the run time, the amount produced, and so on. Because, for example, the cut on the list, which they said you must use the name on the cut, the cut Ruote and the cut Rotelli are both on the 256 lists. But one of those is a special cut and one of those is a standard cut. And they are identical. They are simply different names used for this different cut in different regions of Italy. And so that's why we believe that what the department properly should do is what we said, which is use the production throughput speed as a determining factor based on the fact that it's always been the throughput speed, which has been, that was ultimately used in the original investigation and the subsequent reviews to differentiate between standard and special. And that's the only issue on classification is, is this a special cut or is this a standard cut? All of the other model match criteria, there is no dispute. And that's the situation we have here. And we believe that the record does not support not allowing a differentiation. You add a color, for example, squid ink. Sure. Does that become a different cut? Yes, it becomes a different condom. There are four criteria that go into the condom. The first criteria is shape. The second criteria is additives. The third criteria is wheat type. And the fourth criteria is enrichment. And so your squid pasta would have a different condom because it would have a different number, just like a high-protein product would have a different number than a low-protein product. Sure. And this entire issue relates to the first number and whether it is something is, there's no dispute as to what's long and what's short. There's no dispute as to whether something is a lasagna or a nested. The simple question is, for long cuts and short cuts, they are subdivided into special cuts and standard cuts. And the question is the determining factor, the break point between special and standard. And it always has been a 75% throughput speed. And that's what we were advocating in this case. And I would like to reserve the rest of my time for rebuttal unless you have anything else you'd like to raise at this time. Thank you. Thank you very much. Nothing else. You're making me hungry. Yes, Your Honor. Good morning, Your Honor. Elizabeth Speck for the United States. We respectfully request that the court sustain the remand redetermination. I have a concern here about the consistency of the decision here with the decision in the Court of Administrative Review. And you argue and the CIT has said, well, we don't need to worry about that because it doesn't amount to a practice. And I think that's a fundamental misunderstanding of administrative law. If there's an inconsistency in agency decisions, they have to be explained. So is there, first of all, an inconsistency between the Fourth Administrative Review and what happened here? That's question number one. And two, what did Commerce do to explain the inconsistency and why it was not following the Fourth Administrative Review approach? Yes, Your Honor. The court addressed the Fourth Administrative Review extensively on pages 63 through 68 of the joint appendix. No, I'm not asking about what the court did. No, the Commerce did. I'm sorry. The joint appendix is Commerce's remand redetermination. What did it say? I think it addressed the entire quote from Comment 19 of the Fourth Administrative Review. And it explained that when you consider the quote in context, that Commerce has always required PASTA respondents to adhere to the existing SHAPE methodology unless there is a new SHAPE. Where in this decision are we looking? Yes, Your Honor. 63 talks about the Fourth Administrative Review. 63? 63 through 68 talks about the Fourth Administrative Review. It places the quote in context. It talks about the fact that Commerce has always required them to adhere to the existing SHAPE classification list. Page 67 has the entire quote, which Commerce believes put its quote in context. And then to the extent Commerce said, thus in the Fourth Administrative Review of PASTA from Italy, the Department explained that per its longstanding practice, it expects respondent firms to adhere to the SHAPE classifications contained in the appendix to the initial questionnaire, and that deviations from the appendix apply only to PASTA SHAPES that are not contained in the list. That sounds as though they're saying that there's no inconsistency here. Whereas I read the Fourth Administrative Review, it says for those cuts which PAM believed were specialty cuts, yet the Department considered a regular cut or vice versa, it provided the line speed data. We reviewed this information and accepted the revised SHAPE classification as provided by PAM, which sounds as though they reclassified based on PAM's line speed data, which is exactly what Commerce refused to do here. Well, Your Honor, Commerce addressed that also on page 68 of the joint appendix. They said they made a mistake, is what they said. Yes, Your Honor. We missed what you put over on us. Yes, Your Honor. They said they did. Yes, exactly. And I think that we... Where does it say that? It said while the Department may have ultimately allowed PAM to reclassify certain PASTA cuts that were already listed in the SHAPE list that was included in the initial questionnaire, the Department explained that it did so only because it failed to recognize in time that PAM had, contrary to the instructions in the initial questionnaire, reclassified those SHAPEs. And the Court of International Trade on Remand, and this is in the Court's decision, page 39 of the appendix, noted that to the extent the language the Court just read appears, it would be an outlier and inconsistent with every other administrative review. We specifically cited the Rancher's Cattlemen decision, which says that an action by an agency becomes an agency practice when a uniform... That's my point. Agency, you don't have to show an agency practice to put a burden on the agency to explain the difference. And to the extent that that's the approach that's being taken here by the Court of International Trade, in my view, that is not correct. The Commerce still has to explain deviations from a prior decision, even if it doesn't amount to a practice. And I'm not sure that the explanation here is all that clear. Well, Your Honor, the decision on remand goes into great detail that this is, again, the nature of a model-match methodology is that it's based here on the industry standard, and it's supposed to be something that is consistent and predictable from review to review. Here, this is, again, a well-tested methodology that, again, as the Court noted, the fourth would be one outlier decision, has consistently been based on shape and consistent with Commerce's practice that it will only change its model-match methodology once established if presented with a compelling reason to do so. And shape has never been the sole... Sorry, pardon me. Line speed has never been the sole characteristic. As Commerce explained in the 15th Administrative Review, it's but one of the factors that Commerce looks at. Do you agree that in the fourth Administrative Review they did allow line speed to govern of a particular producer? Your Honor, I think the language is unclear as to what happened in the fourth Administrative Review, but I think it highlights the problems. What's unclear about it? The part I just read you says you gave us your line speed, and we allowed you to reclassify based on that. And Commerce has explained on page 68 of the Joint Appendix... I'm going to just start with the fourth Administrative Review. Isn't the fourth Administrative Review inconsistent with what they did here? If the Court interprets that language to mean it allowed differentiation based on line speed, it would be inconsistent with Commerce's longstanding 20-year methodology that it has consistently adhered to, and it is based on industry standards, based on the physical characteristics of pasta, which is what is required in the statute. Aren't they implying that in the fourth that you told us everything else was the same? Yes, Your Honor. Because that's what the questionnaires do, and it turned out it wasn't after the fact. Yes, Your Honor, and that highlights the danger of allowing deviations in the model match methodology. Again, Commerce is relying on what the respondents submit, and here allowing this consistent... it's more administrable and yields more consistent results when Commerce has this established shape-based methodology and doesn't allow company-specific deviations based on line speeds. What about your friend's argument that the shapes are precisely the same, the pasta is precisely the same, only the name varies, and yet they're classified differently? Your Honor, to the extent that's... I guess he... I'm sorry, I don't quite understand the question. Well, you heard what your opposing counsel said, that a particular rollatini-type shape is named one thing in one region of Italy and one thing in another, but they're produced on the same line with the same ingredients, with the same equipment, and with the same speed, and yet one's classified especially and one's not. Is that true, and if so, why? Your Honor, to the extent it's... again, this is... the methodology was established in accordance with industry standards as agreed to by the Italian pasta makers and the domestic pasta industry. Again, line speed is one factor, but even for the specialty shapes, which are in fact some that are irrelevant to this review, line speed is a factor in distinguishing between short and long cuts, but other shapes of pasta, such as soupettes, lasagna, and nestled or coiled pasta, are produced on separate lines and are classified based on the unique nature of their shape. You're not answering my question. Yes, Your Honor. I think we... it's not... once a shape is classified, it is based on the shape and not the line speed. So initially, as Commerce explained in the 15th Administrative Review, line speed was initially a factor in determining between... distinguishing between short and long cuts, but once there's an established shape, it is based on the shape classification list in Appendix 3. Is there anywhere in the record, and I'll ask your opposing counsel this question when he comes back up, where the example he posits is shown as in the record? That is, exactly the same thing is given two different names and classified differently. I think the examples that... what my opposing counsel is suggesting is that... it suggests that there is leeway for a respondent to reclassify a shape. If they produce a shape that is on the list, then they're required to adhere to Commerce's methodology. And again, it's in... Was this inconsistency argument raised below? Yes, the... I'm sorry, which... The one we've just been talking about. In other words, that Commerce has given different names to the same thing and classified them inconsistently. I believe that opposing counsel raised the example below, but I think Commerce's position is that to the extent that they're arguing that... Again, the shape classification list doesn't give the leeway to the respondent if it produces a shape based on the list. Are they saying that the pasta shapes that are involved here receive different classifications that are inconsistent with each other? No, Your Honor. The pasta shapes on this list are all pasta shapes that appear in Appendix 3 of the... No, I'm asking, did they argue below that the argument about inconsistency is relevant to the shapes involved here? No, Your Honor. I don't believe to their specific shapes. I believe the wagon wheel example was raised below, but that would not be relevant to one of their specific shapes. I believe... I'm not sure if I'm in defendant intervener's time. No, you're still on your own, but feel free to conclude. If the court has no further questions, we respectfully request that the court affirm the Court of International Trades decision. Thank you. May it please the Court. If I may, I'd like to start with Judge Dyke's question about the Fourth Administrative Review, which I agree is probably the one shred of evidence on this record that could support appellant's position, but I'll tell you why that's different. This court in Piscara Mars Australis studied the statute, the statutory provision at issue here, 19-1677-16, the definition of a foreign-like product. And that statute says that commerce has to base the matching criteria on physical characteristics of merchandise being compared. Production speed is not a physical characteristic. Shape is. Why did commerce use that? In the first four segments of this now 23-year-old proceeding, commerce used that to inform the shape criteria. Both specialty cuts and regular cuts can be produced on the same line, and the only way you can distinguish those costs is by throughput rate. If you have a throughput rate of less than 75%, you necessarily have a specialty shape with its attendant higher costs and prices. So commerce has always sought to distinguish those and separate those out. In the fourth administrative review, commerce did a poor job of trying to backfill once they realized respondent had changed the coding. And sometimes respondents change the coding without telling commerce, and it only comes up in the final stage. In that case, they got it wrong, but they've gotten it right in the other 18 segments that preceded this case, and they continue to get it right. Did they say clearly here that they got it wrong in the fourth administrative review? No, they kind of, they do. In the language you just read from the remand, they say, we realized too late. And what they were trying to do was summarize their position from appendix three of their dumping questionnaire, which goes out to every respondent in every case that's at page 227 of our appendix. And it says right there, you must classify your shapes in accordance with this appendix unless two things happen. New standards or the shape's not on there. If you look at that list on page 227, there's four asterisks on that list. Those are new shapes that have been added over the course of this proceeding. A single respondent came forward and said, hey, the shape's not on the list. And they satisfied the evidentiary burden, which appellant did not hear, of providing pictures, providing the name, providing the line speed, and more importantly, providing the rated capacity for the line it's produced on, so Commerce could determine whether it was above or below that 75% threshold. None of that was done in this case. More to the point, there have been five appeals challenging Commerce's shape classification. In this case, it has always been upheld as reasonable. This court has found in Morris Australis and Koyo Seiko that substantial deference, considerable deference is owed to Commerce's interpretation of its product matching criteria. And the trial court has found three times that the shape classification in this case is reasonable. And Judge Rustami in the Produtti case actually dismissed the argument that production speed is a characteristic on which they're basing their matching criteria. You asked Judge Waldaff if there's anywhere on the record where there's two identical shapes classified differently. I'm not aware of that, and that's not on this record. If there was, it would be incumbent upon a party to come forward and suggest a change to the matching criteria. Thank you. Thank you very much. So, Mr. Craven, where is it in the record? Oh, sorry, which question, Your Honor? The shapes. Identical shapes. It is. Identical pasta. It was raised, it's an appendix, our citation's appendix pages 231 and 232. But does that relate to the shapes that are involved here or just some other shapes? No, Your Honor. It was raised, it was raised in the original. No, no. Does it relate to the shapes that we're talking about here? In this particular. Wait, wait, wait. Sorry. Does it relate to the shapes that are involved here or to some other shapes that are not involved in this case? It relates to shapes that are not specifically involved in this case. Well, so what do we care? Well. We're not here to fix every problem in the world. We're only here to address the problem that you raise. Yes, Your Honor. And this is to show, though, that the list is, in fact, should be subject to some alteration. I'm shaking my head no. And I'm shaking my head no because you're not answering my question. Yes, Your Honor. What you said was that a bag of pasta produced on a line with one name on it and a bag of pasta produced on the same line with a different name on it were treated differently. 230 and 231 are a list of names of pasta. That doesn't answer my question. Is there anything in the record that shows what you factually stated? It's in the questionnaire responses, Your Honor, but I do not have a specific citation. We did not produce. We produced only one name of that particular product. The citation was to show that these products have the same product with different names. Well, if you can't cite me to the record, that's fine. Okay. I would also like to call to the Court's attention a statement out of the administrative decision for the fourth review, specifically issue 18 in the IND memo, where the commerce said, however, we understand there may be discrepancies between the shape, categories, lists we provide respondents in the questionnaire, and their own production, which would result in different classifications of certain cuts. Where are you? What page? I am at the issues and decisions memorandum at issue 18 of the fourth administrative review. What page in the record are you at? Because I think I know what they said after that, but I want to look. I do not see a record citation here, Your Honor. Never mind. And I also would note that in the 15th administrative review. I say never mind because if you can't cite us to the record, I'm not even going to listen to what you have to say. It's in the issues and decisions memorandum, so it is part of the administrative determinations that the Court has before it. Which is to say this. In the 15th administrative review, the question before it was whether there was a third type of superspecialty versus specialty, and the Court turned down the request for a modification of the shape line, stating that based on the throughput of the POSTET issue, we can classify them as special short or specialty long because the line speed or throughput rates are 75% or less than the corresponding line speed. Where is it? This is, again, this is the issues and decisions memorandum accompanying Federal Register 78, Fed Reg 9364. Issues and decisions memorandum, I do not believe, are part of the administrative record. And so it is not just the fourth administrative review where the Department has, in fact, distinguished using the 75% basis for determining classification. Thank you, Your Honor. Thank you. The next case for argument is 192044, Flores v. Wilkie.